Thank you, Your Honor. Bruce Fox on behalf of the appellant, Walen Lawson. In the prior appeal that went to the Ninth Circuit, although this court did not reach the merits, it nevertheless noted that having considered the parties' briefs and arguments, we are convinced that Lawson's claims turn on the application of the proper evidentiary standards. And furthermore, it seems reasonably clear that Lawson would survive summary judgment under Section 1102.6. The district court obviously disagreed, instead finding that PPG had met its burden by showing its alternative explanation highly probable. Your Honor, most significantly, the court, in granting summary judgment on behalf of PPG, indicated in footnote 5 that it would make all reasonable inferences in favor of Lawson. And it cited Tolan v. Cotton in a U.S. Supreme Court case, which provided no support for that proposition. It seemed to me almost like the word not was missing from that sentence, because it, I mean, what it says, it literally does say, however, it is within the court's province to weigh the credibility of testimony at summary judgment, which, of course, is 180 degrees wrong. But then it says in the next sentence, accordingly, while the court will make all reasonable inferences in favor of Lawson, the court will not weigh the evidence or its credibility. So it seems that it was a typo, that he meant to say not because the sentence that follows indicates that he wasn't going to do that. I understand, Your Honor, but the reality is he did weigh the evidence, and he did assess the credibility of the witnesses in accepting evidence that was principally based upon Moore's testimony, his deposition in his declaration, and the market walks and other evidence generated exclusively by Moore. He accepted Moore's credibility, despite the fact that Moore had the yawning credibility issues that we've identified. Most significantly, that he had lied to PPG's internal investigators about the mistinning. He said that he did not direct the mistinning, and that was directly contrary to the investigators' findings that he did, based upon the affirmations of the 14 territory managers that he did direct the mistinning. Furthermore, it's of great significance, and the court delighted over this, that Mr. Moore was reprimanded five months after Wally Lawson's termination, and he was reprimanded for precisely what we're complaining about here, for scoring his territory managers based upon whether or not they would mistint. Counsel, is your argument that we should just discount everything, all evidence, from Moore because he's not credible? Because it seems to me that there are things that he discussed in his evidentiary presentation that are either corroborated by others or not even disputed by your client. So I guess I'm struggling a little bit with the scope of the argument you're making. Yes, Your Honor, we do dispute his fundamental credibility on all of the significant issues in dispute here. To the extent that PPG has argued that his testimony is supported by other witnesses, each of those other witnesses had credibility issues as well. Counsel, let me point you to something specific. My recollection is that in your own client's statements, he makes some admissions that he doesn't have a reason to doubt that Moore was relying on or making up information that was the basis for his ratings in the market walks. So if that's true, then why wouldn't we at least consider that information that came from Moore? Well, that can be considered, Your Honor, but the bulk of Mr. Lawson's testimony directly challenged the market walks. And he identified various discrete areas where he was being downgraded, was not being given points that he should have been given points for, and was being penalized during the course of the market walks. The court also should look to examine how these market walks oscillated so much from the initial market walks that Mr. Lawson got, where he had the highest market walk in the country. Then Mr. Moore gave him very low ratings, which culminated in a market walk score of 40, which was less than half of his market walk score he had in his initial market walk. But that last one had a second person go with Moore, correct? Yes, and that was, again, Mr. Kaiser, who was Moore's supervisor. Mr. Kaiser, credibility is at issue. When he was asked his deposition, did he believe that Moore had ordered his territory manager to submit intent? He said, no. And he was asked, why? Why did you say that? And he said, because I didn't order them to submit intent. It was a very bizarre response. And furthermore, Mr. Kaiser had two other regional managers, each of whom was implicated in the same scheme. And one of those, that was Dave Larson and Brian Wells. Mr. Wells was also reprimanded and was given a reprimand letter, just like the one that Mr. Moore was given. So there's a serious question as to whether or not Mr. Kaiser is a credible person. And furthermore, Mr. Larson testified that Mr. Kaiser's demeanor changed substantially during the course of that last market walk. And it changed as Mr. Moore's demeanor changed immediately after Wally had confronted Mr. Moore and told him that, in his view, the misdemeanor constituted thievery. So, counsel, another difficulty that I have with the claim being made here is you've got to have a causal connection to the whistleblowing, the protected activity that you're relying on. And my understanding of the record is that these low market walk scores and the reference to putting Lawson on a personal improvement plan happened before any of the protected activity. So if that's the case, how can you make the causation link that you need to make? Because, first of all, Your Honor, although there were some low market scores in advance of Mr. Larson's confrontation of Mr. Moore, the reality is that within a week of that confrontation in which Mr. Larson called him out and suggested he was engaging in theft, within a week Mr. Moore put Mr. Larson on a performance improvement plan. Except for he told Mr. Moore told your client that he was going to be placed on a PIP before the confrontation and before either of the anonymous reports to the extent you're still relying on those as protected activity. Your Honor, there's no evidence in the record suggesting respectfully that Mr. Moore advised Mr. Larson that he would be put on a performance improvement plan in advance of Mr. Larson's confrontation with Mr. Moore. That only occurred thereafter. What's your record site for that? I don't have a record site because there's no evidence. There's no evidence that PPG has put forward suggesting that Mr. Larson was told by Mr. Moore that he would be put on a performance improvement plan in advance of the confrontation. There is no evidence to that effect in the record, Your Honor. And there is no question that Mr. Moore had failed to comply with basic policies of the company in administering the performance improvement plan, demonstrating further that he and the anonymous against Mr. Larson. He was supposed to meet with him on a weekly basis along with Mr. Mayhew during the whole course of the performance improvement plan. And the record demonstrates that that never happened. There were no such meetings. In fact, Mr. Larson complained to Mr. Mayhew about that. And still, even after he made his complaint, Mr. Larson was just left hanging out to dry. And the whole purpose of a performance improvement plan is to give the employee feedback and to give them guidance to help them achieve and perform. Counselor, I have a question. So my understanding of your argument is that even if there was a basis for putting Mr. Larson on a performance improvement plan, that one of the things Mr. Moore did was not actually assist Mr. Larson in actually improving his performance as required to do under company policy. Like the point of the improvement plan was for the supervisor to assist the employee in improving their performance through regular meetings throughout the plan, and that Mr. Moore acknowledges he didn't provide that assistance. Did the company provide any evidence that Mr. Moore treated the other employees he put on a performance plan in the same way that he treated Mr. Larson? No, the company did not. And that's one of the failings of PPG's evidence in this case. Because the burden of persuasion is upon PPG to demonstrate that it would have terminated Mr. Larson for independent legitimate reasons. The burden to produce evidence concerning how it treated other territory managers, specifically how Mr. Moore treated other territory managers, is a critical absence. I have a similar question on the scoring of the walkthrough. So my understanding is that the differences between a failing score and a successful score, you know, there's a number of points. And that when I look through all the walksheets, you know, there's different points assigned to different things. And I understand one of your arguments to be is that when, for some things that were he was only, Mr. Larson was only supposed to be deducted a certain amount that Moore deducted more than that. Moore deducted a greater amount of points. And then that Moore offered an explanation for why he deducted more points. Is there any evidence in the record from the company showing that Moore deducted greater than the, you know, specified amount of points for other employees? No, and again, the burden is upon PPG to produce that kind of comparatory information, since it bears the burden of persuasion, not just to show by preponderance the evidence, but rather to show by clear and convincing evidence that there were legitimate, independent reasons to terminate Mr. Larson. None of that comparator evidence was provided. We only know that Mr. Moore put three other of his direct reports on performance improvement plans, but we don't know anything other than that. No information was produced about their performance improvement plans or their market walks, how he graded them or the basis for his decision to put them on performance improvement plans. Do we know those other employees were on performance improvement plans for market walks specifically? That we don't know. We don't know. We only know that there were three others. Okay. And do we know that Mr. Larson was the only one who was terminated? Okay. Do we know, is there any evidence in the record showing that the company would terminate employees for low market walk scores? There's no evidence in the record other than Mr. Moore's testimony regarding that and his assertion that Mr. Larson failed to achieve a market walk score that would have allowed him to remain at the company. But Mr. Moore was the primary mover and driver of Mr. Larson's termination, was wholly responsible for manipulating the scores in the market walks. There was no effective oversight. We demonstrate in the record that Mr. Moore was left essentially to, despite the fact that he had been reported on by Larson of all people, he was left to supervise Mr. Larson without any independent supervision of him. All right. Did you want to save some time for rebuttal? Yes, Your Honor. Okay. I will. Thank you. All right. And we'll hear now from Ms. Cogbill. Good morning, Your Honors, and may it please the Court. My name is Karen Cogbill, and I represent the Pele PPG. So we're here on the principal issue of whether or not the district court properly granted summary judgment on the 1102.5 claim, and the district court did. And it did after finding that there was a contributing factor, that there was protected activity, which we can talk about in a minute, but more importantly, that the evidence that PPG offered was clear and convincing that it would have made the same decision, notwithstanding any alleged protected activity. So the question is, what is that decision? The decision is to terminate an employee who fails to meet the expectations of their job after being placed on a performance improvement plan. But I ask you the same questions. Is there so because part of what we're dealing with is burdens, right, which under the California Supreme Court's decision in this case, the burden is on your client to show not only that it had a reason to terminate Mr. Larson, but that it would have, right, regardless of his protected activity. And normally, you know, we'd be asking a plaintiff to show all the comparators and all those things. But in this case, the burden is on your client to show that, you know, Mr. Moore would, I think, my understanding of the theory of the case is that, you know, he would have deducted the same points from any employee, right? That he would have managed the performance improvement plan in the same way for any employee, that he would have recommended termination under the same circumstances for any employee. So I see evidence that certainly that there's some basis. But what I don't see is any comparator showing that Mr. Moore has treated other employees, similarly situated employees, in the same way. Yes, so, Your Honor, a few things to note. One is counsel represented that there is, that Mr. Moore had placed other individuals on a performance improvement plan and had not terminated them. That is not in the record. In fact, I believe Mr. Moore's testimony was, which again isn't in the record, but Mr. Moore's testimony was that Mr. Larson was the first individual that he had placed on a performance improvement plan. So the challenge is to ask us to put forth competitors as far as, you know, the performance improvement plan goes. In the absence, you know, if there is no competitor, if there is no comparator, right, then what we have to look at is, is Moore's behavior consistent? And we will look at the scoring of the market walks. If we look at the March market walk, right, so to back up, the argument that Larson has repeatedly made is he doesn't dispute the factual underpinnings in the market walk, right? He doesn't dispute that he didn't have the right placement of product. He doesn't dispute that he hadn't met the objectives. He doesn't dispute, for example, that he had a force out, which is one of the issues in the August market walk. What he says instead is, you should not have taken all of the points away from me. I should have gotten some of them, right? So he admits his performance deficiencies. It's just a matter of how it was scored. Well, and I can imagine that that would make, I mean, if there's one of the things that there was guidance, you should only detect, you know, this many points and more exceeded that. Right. And so why isn't that, why couldn't a jury, you know, reasonably conclude, I understand Moore says I had a reason for exceeding the guidance, but it seems to me then that turns on Moore's credibility. Why couldn't a jury say, well, the reason why you deducted more than you were, you know, more than the standard amount of points is because of his protected activity. You know, there's, I mean, it comes down then to Moore's subjective intent, and without any comparator, why isn't there, why couldn't a jury, why isn't that a fact question for the jury? So, Joanna, I think there's two things to clarify here. One is there is no evidence that Moore violated any company policy with respect to how he scored. Right. He did not take off more points than what he was allowed. Right. I was saying it was allowed, but it was there was some guidance. There's no guidance. He said I, I am. Sorry, sorry, Your Honor, and I don't mean to be, but there's nothing in the record that suggests that Moore didn't follow guidance. There's an argument by counsel, certainly, that Moore didn't follow the proper procedure in how he scored the market walk. But if you look at the evidence that counsel cites, it's the market walk itself. And the market walk itself just lists how many points are available for that category and then the number of points that Moore gave. Right. Moore never gave, you know, if it said you could subtract five points, Moore subtracted five points. Right. The guidance doesn't say you should subtract two and Moore subtracted five. I assume this is not the only markets walk through score that Moore has ever given. So is there any evidence showing that he's deducted similar amounts of points for similar deficiencies from other employees? So what you can see is actually if you just look at the comparison of loss and own market walks, both before and after the alleged protected activity, Moore's scoring is consistent. So if you look at the March market walk, for example, Moore either gives him all the points or no points in a category, which is the same thing that he's doing in August. Right. So Moore himself is being consistent in how he's scoring loss and his own market walks from the beginning. Right. And you can see this in loss and his admission that he felt the way that Moore scored those market walks was unfair from the beginning. He has never liked how Moore, sorry, let me say that again, loss and has never liked how Moore scored his market walks. But Moore has been consistent all along in how he's scored them and in what he's taken points off for. Can I come back to a question I was asking your friend across the aisle? I'm trying to nail down this timing of when the PIP issue first comes up and the protected whistleblower activity. Correct. So my understanding of the record is that Mr. Lawson testifies he was told by Moore on April 21st, which was the date of a market walk, that he was going to be placed on a PIP. And then I think the record is unclear as to when the alleged confrontation between Lawson and Moore happened, but the inference from what we do have is that it was sometime after that. That's correct, Your Honor. So the record citation is at 297 of the record where Mr. Lawson testifies that at the conclusion of the market walk on April 21st, Moore discussed with him that he'd be placed on a performance improvement plan. You also have in the record the testimony from Moore and from Mr. Mayhew that the conversations about the PIP had occurred prior to that April market walk. Because what happens here is you've got the scores come in, the sales numbers. And so the sales numbers come in quarterly. They come in at the beginning of April, and they show that at that point Mr. Lawson has failed to meet eight of the prior 12-month sales numbers, meaning six consecutive ones. And then we also have the December market walk and the March market walk. So there's discussion about putting him on the performance improvement plan, right? And that discussion is had with Mr. Lawson at the conclusion of the April one. Your Honor is correct that the record is not clear as to when Mr. Lawson allegedly engaged in this conversation with Mr. Moore. Mr. Lawson's testimony contradicted, he contradicted himself in his deposition as to when that was. But we know for certain that it was at some point after Friday, April 21st. And we know that because that's the day that he made the anonymous complaint, right? And he confirms that, and that's also the day that he is physically present with Mr. Moore at the end of the market walk. And he admits that he did not have the conversation with Mr. Moore while they were physically present at that market walk. So we know that it's at some point after that. And what about Mr. Moore's admission that he did not meet with Mr. Lawson during the course of the performance improvement plan? The whole premise of, and I think it's admitted, that he was supposed to be meeting regularly with Mr. Lawson in order to help him improve his performance and that that did not happen. You're correct, Your Honor, that we do acknowledge that did not happen during the initial term of the performance improvement plan. But the performance improvement plan was extended for an additional 30 days to give Mr. Lawson that additional opportunity to improve his performance. What I think is worth noting here is that Mr. Lawson is not suggesting, has never suggested, that had he had more guidance from Mr. Moore, he would have somehow met any of the requirements of the PIP. And if we go back to the PIP, there's five specific things that Mr. Lawson had to do in order to successfully complete that PIP. And there is no dispute that, so one of them is his sales numbers, that he's supposed to get a positive in the sales quota. He doesn't dispute that. That never happened. It didn't happen in January, February, March, April. May he's placed on the PIP. It doesn't happen in May. It doesn't happen in June. The sales numbers never get positive for Mr. Lawson. He's supposed to score a successful on his market walk.  He's supposed to meet the regional and national objectives. He does not dispute. He didn't do those objectives. So there's really no fundamental dispute here for Mr. Lawson. Who were the ultimate decision makers on the termination? So the record reflects that Mr. Moore made the recommendation for termination and that that decision was supported, that HR supported that decision. But the ultimate question under the governing law is that you have to show that the decision would have been made by clearing convincing evidence. The decision maker is a person who has these objective elements but also has been engaged in some substantial misconduct within the company for which he's reprimanded and which Mr. Lawson didn't go along with and filed complaints, including the complaint that led to the investigation. Isn't that a classic tribal issue as to this decision maker who's got mixed motives and someone's got to decide which one he was acting on? I mean, he may have really liked getting Mr. Lawson out of this because of him getting reprimanded for what Lawson blew the whistle on. So a few things, Your Honor. First, there's no evidence in the record that at the time Mr. Moore made the recommendation to terminate that he was aware of any of the whistleblower complaints. He was aware of the confrontation, and he may well have suspected, based on that confrontation, that he was the source of it. There's nothing in the record that would suggest that other than that. That's an inference just from the playing out of the facts. He gets this rather animated conversation on, I think, the Blue Brief claims it was April 24th, where he says he's not going to go along, and then, you know, all of a sudden there's this internal investigation that leads to this. It's a reasonable inference that he's going to think that it's Lawson. You may deny that, but that's why we have trials. Yeah. So first, just from a factual standpoint, the record, and if you look at the record, it's page 87, is where Mr. Lawson discusses the conversation he has with Mr. Moore, where he allegedly says, I'm not going to go along with this. There is nothing in the record to suggest that this was an animated conversation, that Mr. Moore was in any way aggressive. Well, that's a factual dispute. But this is Mr. Lawson's own testimony. Mr. Lawson's own testimony is simply that he confronts him. Mr. Moore says, stop it. You know, it's none of, he says, literally, don't worry about it. Don't concern yourself. Mr. Lawson never says that Mr. Moore yelled at him or got aggressive with him. That's all counsel's argument. Well, even if it's not, it doesn't have to be aggressive for Mr. Moore to recognize that Mr. Lawson is saying, I disagree with what you're telling us to do, that I think it's a problem. I think there's, I believe there's a factual dispute in an assertion, allegations, or testimony that Mr. Lawson essentially accused Mr. Moore of being unethical and violating the law. Yeah, I do understand that. And I recognize that that is what Mr. Lawson's allegation is. But going back. Right, so he could testify to that, and then a jury would have to decide whether to believe him, right, and whether Moore would have put two and two together. Because there's no dispute that Mr. Moore was under investigation. So Judge Sung, that goes to the contributing factor. That goes to whether or not Lawson can show that his protective activity was a contributing factor in the termination, right? The district court held that he could show that, right? So now the question is under 1102.6, right? And that's, I think, goes back to your question, Judge Collins, which is that the whole premise of an 1102.6 affirmative defense is that there is a mixed motive, right? Is that the employer has the jury, or in this case the district court, has already accepted that the plaintiff can show that the protective activity was a contributing factor. And it's your burden to show same decision. Correct. Despite the mixed motive. Correct. And so by clear and convincing evidence. But what I don't see is there seem to be material factual disputes all over the place in terms that do depend on Moore's credibility, which I think is rightly disputable given that he's, you know, continuing to deny things, you know, that he denied that are then proven to be untrue. Like he denied directing employees to misdemeanor. Then there's a finding by your own company that he, in fact, gave that directive. He denies that he made the recommendation to terminate Mr. Lawson. Then it's actually, you know, by your own evidence that he did make the recommendation to terminate Mr. Lawson. So there is a serious credibility issue with respect to things that are material to the case. So let me, and I see that I'm getting close to the end of time, but I would like to answer this question because I think it is an important one, which is that, so one, the cases that talk about the credibility, right, that counsel has pointed to are when there is a direct dispute as to the underlying decision. So, for example, right, the company comes forward and says, we hired this person because they were more qualified. And the plaintiff puts in direct evidence that they, in fact, were more qualified. Right, so then we have a credibility as to, you know, the person suggesting that, like that calls into question. This is separate. Whether Mr. Moore engaged in other activity, right, whether he made this, you know, alleged mistinting directive, whether he should have been disciplined because of it, is not, you know, Mr. Moore and Mr. Lawson are not comparators. What we have here is when we talk about material disputes and disputes of fact, what we have to look at is, are the underlying facts that gave rise to the performance improvement plan and subsequently the termination in dispute? And those are not, right, those underlying facts are not in dispute. I still mess with the problem that the very person who has the mixed motive, right, that is the one who is in charge of literally deciding whether he gets 0, 1, 2, 3, or 5 on all these things and that the margin of, you know, giving 3 or 5 points on very, you know, things, can make the difference between him succeeding on the performance plan or failing on the performance plan. The very same individual is the one who then doesn't do any of the meetings throughout the very first performance plan. That same individual is the one who makes the recommendation for termination. So why isn't, you know, I understand you're saying there's countervailing evidence, right, but it does in large part turn on, you know, I think classic disputes of fact that we shouldn't be resolving on summary judgment. And even, you know, even in terms of the broader decision, I don't see evidence of, you know, similar walk-through comparisons. I don't see evidence of, you know, even other employees being terminated by PPG under similar circumstances, right, to say that, you know, PPG would have made the same decision, right, that it does normally terminate people for this type of performance issue. And at this time period, you know, after giving, you know, one extended performance plan. So really fascinating. I do see that amount of time. But the performance improvement plan had multiple things that Mr. Lawson had to meet. One of them was a successful score on the market walk, right? So what Lawson has argued is that had I been scored differently, right, but he didn't get the successful score. That's only one component of it, right? He's not challenged any of the other four things that the PIP required of him that he did not do. The other thing I would say is I would just remind the court to look at that there's been no difference in how Mr. Moore scored Mr. Lawson before and after the protected activity. He has remained consistent. And if you look at the feedback that he gave Mr. Lawson at the end of each of his market walks, the end of the December market walk, at the end of the March market walk, it is the same performance concerns that he is continuing to raise and then ultimately give rise to the termination, right? So this isn't a situation where we have an employee who engages in protected activity and now all of a sudden we have a manager who is trying to discipline him or raise these issues, right, and that we are only basing this on performance that happens after the protected activity. There's been no change in how Mr. Moore acted. At that point, I believe there is one score that predates the protected activity that everything else postdates it. So is that correct? That's not correct. Mr. Moore gave Mr. Lawson a market walk in December. He gave him one in March, and he gave him one in April before there was any protected activity. And those are all scored consistently with the subsequent ones in July and August. Thank you. Thank you, counsel. We'll hear rebuttal now. Sure, Your Honors. Just one thing. Mr. Moore did, I think it's very significant, assessing the market walks and how legitimate they were. Mr. Moore did give Mr. Lawson, before Mr. Lawson confronted him, an annual performance review in which he rated him satisfactory. He passed him. It was only after Mr. Lawson had complained that the market walks went down. And it really has to be taken into consideration that the final market walk was much lower. The rating was much lower than any of the previous scores. It went down to 40, which was abysmal. I want to ask you a follow-up about the exchange you had with Judge Forrest about the timing of the performance improvement plan. Because your opposing counsel has given us the site, and I've looked at it, and it does say that Lawson testified that he was told he would be put on a PIP on April 21st. Your brief says that the date of the confrontation was April 24th, which would put it after he was told that he would be put on a PIP. But you said the opposite to us in your opening argument. Can you address that? Yeah, I believe that his testimony on that was somewhat unclear. He testified that the confrontation occurred sometime between April 18th and April 24th. We've cited to the record. I'm looking at your brief on this point, and it said that it was on April 24th. Let me find the reference here. It's on page 13. A few days later, April 24th, 2017. Oh, at the latest. Okay, I see. I see. So you say there was a range as to when that may have happened. All right. Yeah, the testimony is unclear on that. But it is Mr. Lawson's belief that he would not have been put on a performance improvement plan, certainly would have been discharged had he not complained. The court also has to take into account Mr. Lawson's testimony about how Mr. Moore reacted when he confronted him. He did say, and this is cited, it's ER 150, when he was asked, did he get animated? Say again, did he get animated? He was upset when he heard the word falsify. And then he further said, Clarence knows about all the issues with my training roster and what happened to my records. So that's another issue, Your Honor, that there was a claim for the first time that was made at Mr. Lawson's termination session that he had somehow falsified his training roster. And the district court just brushed over that, suggested it was a matter of semantics, but there was no evidence in the record suggesting that Mr. Lawson intentionally made mistakes in his training roster. Rather, the testimony was that Mr. Moore knew there were problems with his iPad, and that made it difficult to maintain the proper data as to the training roster. Counsel indicated that there was no testimony that the three others had been put on the performance improvement plan. If I could cite to the record, page 134, Mr. Moore was asked, other than Wally Lawson, did you ever put any territory managers on the performance improvement plan? I did. Who were they? Michael Cordova, Kelly Musterman, and Laura Sanchez. I believe that was it. Again, no information has been provided, including their performance improvement plans, or their sales data, or their market walks, for the plaintiff to make, for the court to make a meaningful assessment as to whether or not PPG had carried out its burden to prove by clear and convincing evidence it would terminate Lawson for independent and legitimate reasons. Okay. All right. Thank you, Counselor. You've gone over your time. Do you have further questions? Okay. All right. Thank you, Counselor. So the case just argued of Lawson v. PPG Architectural will be submitted, and we will take a five-minute recess before hearing argument in the final case.
judges: COLLINS, FORREST, SUNG